O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CELIA C.,

        Plaintiff,

  v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

        Defendant.

Case No. 2:17-cv-07037-KES

MEMORANDUM OPINION AND
ORDER

## I.

## BACKGROUND

Celia C. ("Plaintiff") was born in 1958 outside of the United States. Administrative Record ("AR") 75, 229. She completed the second grade in 1966. AR 265. She came to the United States at age 14; she became a naturalized citizen, but she did not pursue school and never became proficient in English. AR 74-75. Between 1997 and 2007, she worked as an inspector for a supplement manufacturer, a retail laborer at Target, a newspaper stuffer, and a school janitor.

---

[1] Effective November 17, 2017, Ms. Berryhill's new title is "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."

1

1   AR 78-79, 265.

2          During her last job as a school janitor, she developed back pain.  AR 81.  It

3   worsened over three years until she had surgery on her right shoulder in 2010.  AR

4   81-82, 700.  Five months after her surgery, she returned to work and continued to

5   work as a janitor, although she may have had a second shoulder surgery in 2011.

6   AR 82, 90.  When a doctor involved with her workers' compensation claim told

7   her that she should not do work that required lifting more than five pounds, she

8   asked her supervisor if she could be reassigned to a security guard position.  AR

9   83.  The supervisor declined the reassignment because of Plaintiff's limited

10  English.  Id.  Plaintiff decided not to continue working as a janitor, noting at the

11  time that "worker's comp was paying [her]."  Id.

12         In May 2013, Plaintiff filed an application for disability insurance benefits

13  ("DIB") alleging a disability onset date of May 18, 2012, the same day she says

14  she stopped working.  AR 264.  Plaintiff initially identified her disabling

15  conditions as injuries to her back and shoulder.  Id.

16         On January 27, 2016, an Administrative Law Judge ("ALJ") conducted a

17  hearing at which Plaintiff, who was represented by counsel, appeared and testified,

18  as did a vocational expert ("VE").  AR 68-100.

19         On February 12, 2016, the ALJ issued a decision denying Plaintiff's

20  application.  AR 23-41.  The ALJ found that Plaintiff suffered from the medically

21  determinable impairments of "right shoulder arthropathy (status post rotator cuff

22  repair) and depressive disorder."  AR 28.  Despite these impairments, the ALJ

23  determined that Plaintiff had the residual functional capacity ("RFC") to perform a

24  reduced range of medium work limited to "simple routine tasks and simple work-

25  related decisions."  AR 30.

26         Based on this RFC and the VE's testimony, the ALJ determined that

27  Plaintiff could perform her past relevant work as a store laborer, which the

28  Dictionary of Occupational Titles ("DOT") classifies as medium, unskilled work.

2

1 AR 35.  The ALJ concluded that Plaintiff was not disabled.  AR 35-36.

2                                     **II.**

3                        **STANDARD OF REVIEW**

4          A district court may review the Commissioner's decision to deny benefits.

5  The ALJ's findings and decision should be upheld if they are free from legal error

6  and are supported by substantial evidence based on the record as a whole.  42

7  U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue,

8  481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such relevant

9  evidence as a reasonable person might accept as adequate to support a conclusion.

10 Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir.

11 2007).  It is more than a scintilla, but less than a preponderance.  Lingenfelter, 504

12 F.3d at 1035 (citing Robbins v. Comm'r of SSA, 466 F.3d 880, 882 (9th Cir.

13 2006)).  To determine whether substantial evidence supports a finding, the

14 reviewing court "must review the administrative record as a whole, weighing both

15 the evidence that supports and the evidence that detracts from the Commissioner's

16 conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998).  "If the

17 evidence can reasonably support either affirming or reversing," the reviewing court

18 "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.

19         "A decision of the ALJ will not be reversed for errors that are harmless."

20 Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  Generally, an error is

21 harmless if it either "occurred during a procedure or step the ALJ was not required

22 to perform," or if it "was inconsequential to the ultimate nondisability

23 determination."  Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

24                                    **III.**

25                        **ISSUES PRESENTED**

26         Issue One:  Whether remand is required to permit the ALJ to evaluate new

27 medical evidence that the Appeals Council did not make part of the AR.

28         Issue Two:  Whether the ALJ erred in evaluating the medical opinion

                                      3

evidence.

    <u>Issue Three</u>:  Whether the ALJ erred in assessing Plaintiff's RFC.
(Dkt. 29, Joint Stipulation ["JS"] at 3.)

**IV.**

**DISCUSSION**

A. **Issue One: New Evidence.**

    **1.  Factual Background.**

    After the ALJ's adverse decision, and as is relevant here, Plaintiff submitted the following proposed new exhibits to the Appeals Council:  (1) Treatment records from the San Fernando Mental Health Center ("SFMHC") dating from November 2014 through January 2015 (AR 764-67); (2) a mental disorder questionnaire completed by SFMHC psychiatrist Dr. George Sabounjian in May 2017 (AR 754-57); and (3) a Psychiatric Medical Source Statement, also completed by Dr. Sabounjian in May 2017 (AR 758-62).[2]  (JS at 3.)

    The 2014-2015 SFMHC records include (1) an individual service progress note by psychologist Nancy Chandler dated November 6, 2014, referring Plaintiff for a medical evaluation with Dr. Gregory Doane (AR 766), (2) a medication progress service note ("MPSN") from Dr. Doane dated November 6, 2014, indicating that Plaintiff "agreed to trial of Zoloft for depression" (AR 765); (3) a MPSN from Dr. Shanthi Keshava dated January 7, 2015, discontinuing Zoloft due to side effects and prescribing Celexa (AR 764); and (4) a letter dated May 5, 2017, from psychiatrist Dr. Ryan Horst verifying that Plaintiff is a client of SFMHC who was first seen by Dr. Horst on January 21, 2015 for medication support services due to a diagnosis of major depressive disorder[3] (AR 763).  The

---

[2] Plaintiff implies that the Appeals Council never received the additional proposed new exhibits.  (<u>See</u> JS at 3-4.)  The Appeals Council explicitly referenced these exhibits and therefore apparently received them.

[3] At the January 2016 hearing, Plaintiff testified that she had started seeing a

4

Appeals Council concluded that this evidence did not change the outcome of the ALJ's decision and therefore "did not consider and exhibit this evidence." AR 2.

The Appeals Council also declined to consider or make Dr. Sabounjian's new records part of the AR, reasoning that they did not relate to the relevant time before the ALJ's decision. Id.

### 2. Rules Governing the District Court's Consideration of New Evidence Where the Appeals Council Did Not Make the Evidence Part of the Administrative Record.

The Appeals Council declined to make the relevant records part of the administrative record.[4] District courts within the Ninth Circuit use "sentence six" of 42 U.S.C. § 405(g) to address a plaintiff's allegations that the Appeals Council improperly refused to consider additional evidence presented by Plaintiff. See Knipe v. Colvin, 2015 WL 9480026, at *6 n.7 (D. Or. Dec. 29, 2015); see also Rocha v. Astrue, 2012 WL 748260, at *4 (D. Ariz. Mar. 7, 2012) ("The Appeals Council stated that they looked at the [new evidence].... The Government is correct, that the Appeals Council did not 'consider' this evidence. Accordingly, this Court considers this evidence under the lens of 42 U.S.C. § 405(g), sentence six."). Under sentence six, a court may remand a case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

To be material, the new evidence must bear "directly and substantially on the matter in dispute." Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001)

_____

psychiatrist approximately one year or eight months earlier. AR 85. She initially saw him every 15 days, then every month. AR 86.

[4] The documents are before the Court only as part of the record of administrative proceedings, rather than medical evidence exhibits.

5

(citation omitted).  This means that the new evidence is "probative of [the claimant's] condition as it existed at the relevant time—at or before the disability hearing."  Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 511 (9th Cir. 1988).  Materiality requires claimants to "demonstrate that there is a reasonable possibility that the new evidence would have changed the outcome of the administrative hearing."  Mayes, 276 F.3d at 463.

"To demonstrate good cause, the claimant must demonstrate that the new evidence was unavailable earlier."  Id.; see also Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985) ("If new information surfaces after the Secretary's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied.").

### 3.  Evidence Rejected by the Appeals Council

#### a.  Materiality.

Plaintiff argues that Dr. Sabounjian's new records are material to the relevant time because they "relate to [Plaintiff's] conditions, treatment, symptoms and limitations that were present on or before the ALJ's decision."  (JS at 5.)

The mental impairment questionnaire indicates that Plaintiff has been a client at SFMHC from December 2014 through May 2017, but it does not state when Dr. Sabounjian treated Plaintiff.  AR 754.  Dr. Sabounjian wrote that Plaintiff "started group therapy and medication three years ago" (i.e., in 2014), but she is "very tearful in groups" and "continues to not be motivated."  Id.  He also wrote that she "sees the doctor one time per month," but did not say which doctor.  Id.  The questionnaire asked Dr. Sabounjian to assess Plaintiff's "current level of functioning."  AR 756.  He opined that she was "isolated from family," over sleeps, and "will go 90 days without taking a bath."  AR 754-55.  At times she would not leave the house.  AR 756.  She also had "problems" managing her money.  AR 757.

These opinions sound quite different from the evidence before the ALJ.

Plaintiff did not describe isolation from family.  Plaintiff testified that she went grocery shopping with her adult daughter weekly and lived with her adult son.  AR 74, 76, 289.  Her children helped support her.  AR 77.  Her sister would bring her food, invite her over for meals, and help with house cleaning.  AR 87, 289.  She also visited her nieces and spent time with her grandson.  AR 87, 288.  Her family submitted letters in support of her DIB application.  AR 318-19, 321-23.

Far from not bathing or leaving the house, at the time of the 2016 hearing Plaintiff was enrolled in an English as a Second Language ("ESL") class at a local college, because "I don't have anything to do at home, and I want to learn how to write and read English."  AR 76, 88.  Plaintiff started taking ESL classes in 2014.  AR 320.  On a daily basis, she went to school two or four hours.  AR 76.  While sometimes she did not want to go to class, she attended enough to pass from the first year to the second.  AR 89-90.  She drove herself to class.  AR 87.  On an average day in 2013, she would groom herself and take a short walk to the public park which "relaxes [her] and helps [her] feel fit."  AR 288.  On an average night, she would sleep six hours.  AR 290.

Based on the wording of the questionnaire, the ambiguity concerning when Dr. Sabounjian (as opposed to the other doctors at SFMHC) treated Plaintiff, and the significant differences between Dr. Sabounjian's assessment of Plaintiff's depression-related functional limitations and Plaintiff's own reported activities at or before the disability hearing, the Court agrees that the questionnaire does not relate to the relevant time.  Thus, by definition, this questionnaire is immaterial.

In contrast, Dr. Sabounjian's medical source statement is expressly retrospective.  He opined that the functional limitations he described were "reasonably consistent" over three years of treatment, i.e., from 2014 – 2017.  AR 762.  While this means that the medical source statement relates to the relevant time, per the above-cited authorities, the statement is only "material" if there is a reasonable possibility that it would have changed the outcome.

There is no reasonable possibility that Dr. Sabounjian's medical source statement would have changed the outcome for several reasons. First, it is internally inconsistent, rendering it unreliable. For example, he opined that Plaintiff has an "extreme" limitation interacting with others, but also opined that she could interact with co-workers 70% of the time. AR 758, 761. He first opined that Plaintiff would likely not report for work because she "walks away from group therapy and activities," but then opined that she would miss work due to "poor memory." AR 760-61. At the same time, he acknowledged that she reliably attended medical appointments. AR 761. The medical source statement is also inconsistent with the questionnaire he signed on the same day. <u>Compare</u> AR 758 (opining that Plaintiff has thoughts of suicide) <u>with</u> AR 760 (opining that Plaintiff does not have thoughts of suicide).

Second, the medical source statement is inconsistent with SFMHC's treating records generated during the relevant period. At Plaintiff's intake assessment, she denied suicidal ideation. AR 725. None of the subsequent progress notes report suicidal thoughts or consider Plaintiff a danger to herself; most expressly disclaim such findings. AR 722-45 (compare AR 758 [Dr. Sabounjian opining that Plaintiff has thoughts of death or suicide].) Dr. Sabounjian found her "moderately" limited at understanding, remembering, and executing simple, 1- or 2-step instructions, and that this functional limitation had been consistently present over three years. AR 758, 760. In contrast, Plaintiff told the SFMHC staff, "I don't want my [crying spells] to interfere with the ability to focus at school so that's why I am asking for help." AR 728. They discussed practicing positive self-affirmations and journaling. <u>Id.</u> At the next appointment, Plaintiff reported feeling better in part due to practicing these adaptive coping skills. AR 727. On February 12, 2015, Plaintiff reported feeling "much better" than several months ago. AR 732. She stated that the prescribed medication helped her feel motivated to move forward. <u>Id.</u> She was attending ESL courses 5 days a week, eating healthier, and taking a

10-minute walk 3 times a week.  Id.  Thus, the treating records show improvement with treatment and Plaintiff's ability to do activities more complex than following simple 1- or 2-step instructions.

Third, Dr. Sabounjian's medical source statement is inconsistent with Plaintiff's reported activities.  As discussed above, Plaintiff was able to drive herself to daily ESL classes, go out in public to shop and visit the park, and interact frequently with family members.  This is inconsistent with his opinion of an "extreme" limitation interacting with others and an inability to do even simple tasks.

Fourth, the treating records from SFMHC do not mention Dr. Sabounjian.  AR 722-45, 764-68.  It is unclear what treating relationship he had with Plaintiff or when.  His observations discuss Plaintiff's participation in group therapy, so perhaps he was a group facilitator.  The fact remains, however, that the AR does not contain a single record documenting a treating appointment between Plaintiff and Dr. Sabounjian.

For all these reasons, the Court finds Dr. Sabounjian's medical source statement immaterial.

Last, the Court concludes that the additional pages of records from SFMHC are immaterial.  The 2014-2015 SFMHC records do not provide significant new information.  At the time of the ALJ's decision, the AR reflected that Plaintiff was seeing Dr. Horst for medication support services.  Compare AR 763 and AR 724.  The AR also reflected that Plaintiff had tried Zoloft to treat depression, experienced side effects, and started taking Celexa.  Compare AR 764-65 and AR 742.  The new records, therefore, have no bearing on whether the ALJ's "not disabled" finding is supported by substantial evidence.

b.  Good Cause.

Plaintiff's treating relationship with SFMHC started in 2014.  AR 722 (noting admission date).  The JS does not address why Dr. Sabounjian failed to

provide any opinions before the ALJ's decision. Plaintiff has not carried her

burden to establish good cause for failing to submit opinions by Dr. Sabounjian

earlier. Nor has Plaintiff demonstrated good cause for failing to obtain and submit

the additional 2014-2015 SFMHC records, especially given that she obtained and

submitted other SFMHC records to the ALJ before the 2016 hearing.

B. **Issue Two: Medical Opinion Evidence.**

Plaintiff argues that the ALJ erred by (1) failing to give sufficient reasons for

giving "little weight" to the opinions of treating physician Dr. Bulczynski,

(2) failing "to reject, discuss or acknowledge Dr. Coppelson's May 2012 opinion,"

(3) rejecting the records and opinions of treating psychiatrist, Dr. Horst, (4) failing

to discuss the records of treating chiropractor Brian Padveen, and (5) failing to

articulate a finding for weight afforded to the consultative examiner ("CE"), Dr.

Wallack. (JS at 14, 18, 22-23, 28.)

### 1. Rules for Weighing Conflicting Medical Evidence.

If a treating physician's opinion is well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the] case record, [it will be given] controlling weight."

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); see also 20 C.F.R. §

404.1527(c)(2). To reject an uncontradicted opinion of a treating physician, the

ALJ must provide "clear and convincing reasons that are supported by substantial

evidence." Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005). An ALJ may

only reject a treating physician's contradicted opinions by providing "specific and

legitimate reasons that are supported by substantial evidence." Ryan v. Comm'r of

Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008).

Only physicians and certain other qualified specialists are considered

"[a]cceptable medical sources." Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir.

2012); see also 20 C.F.R. § 404.1513(a). Chiropractors are considered "other

sources." 20 C.F.R. § 404.1513(d)(1). While their opinions must still be evaluated,

20 C.F.R. § 404.1527(c), the ALJ may "discount testimony from these 'other sources' if the ALJ 'gives reasons germane to each witness for doing so.'" Molina, 674 F.3d at 1111 (quoting Turner v. Comm'r of SSA, 613 F.3d 1217, 1224 (9th Cir. 2010)).

### 2. Dr. Bulczynski.

Dr. Bulczynski initially examined Plaintiff on June 13, 2012. AR 705. He noted that she had undergone surgery in June 2010 on her right shoulder, but she reported that the surgery made her shoulder pain worse. AR 706. Plaintiff had tenderness to palpations over her right shoulder blade and some reduced range of motion. AR 709-10, 712. She had normal posture, muscle tone, and motor strength. Id. He administered numerous tests, all of which yielded negative results. AR 711. He opined that she had "cervical radiculitis with pseudo-radiculitis radiating to the right shoulder blade." AR 713. As "work status," he limited her "lifting, pushing, and pulling to five pounds." Id.

On September 5, 2012, Dr. Bulczynski completed a "physician progress report." AR 681-85. He noted that Plaintiff had completed six physical therapy sessions since July 2012, but she reported increased right shoulder pain, worse with movement but improved with medications. AR 681. Again, Plaintiff had tenderness to palpations over her right shoulder blade and reduced range of motion. AR 682. She had normal posture, muscle tone, and motor strength. AR 682-83. He administered multiple tests with only two positive results indicating shoulder pain with movement. AR 684. He concluded, "the patient failed to improve despite conservative measures including physical therapy. The patient had an MRI of the cervical spine earlier this year on 06/22/12 without significant findings of neural element impingement. The patient also underwent an MRI of the right shoulder without contrast on 05/04/12, revealing no significant full-thickness rotator cuff tearing." AR 685. He noted that Plaintiff was scheduled for an arthro MRI "to evaluate the further healing of the rotator cuff" and a possible "occult

labral tear." Id.  As "work status," he opined that Plaintiff was limited in "lifting, pushing, and pulling to 5 pounds."[5]  Id.

On September 12, 2012, Plaintiff underwent the arthro MRI.  AR 719-20.  It revealed "no discrete glenoid labral tear."  AR 720.  It also showed no swelling or atrophy of the rotator cuff musculature.  AR 719.

The ALJ gave "little weight" to Dr. Bulczynski's lifting restriction because, "Dr. Bulczynski's reported findings were largely within normal limits, and thus his assessment of a five-pound lifting restriction appears rather extreme.  This opinion is further diminished by the fact that Dr. Bulczynski's treatment relationship with the claimant was very brief and in the adversarial context of a worker's compensation claim."  AR 34.  The ALJ further found that Dr. Bulczynski's five-pound lifting restriction "contrast[ed] sharply with the other contemporaneous medical findings and opinion evidence."  Id.

Plaintiff first argues that the ALJ mischaracterized Dr. Bulczynski's findings as "largely within normal limits."  (JS at 20.)  Plaintiff argues that "multiple significant and abnormal findings were identified …."  (Id.)  Plaintiff, however does not explain what she views as "significant and abnormal" findings.  The ALJ properly summarized Dr. Bulczynski's reports as stating largely normal findings while noting the post-2010-surgery status of Plaintiff's right shoulder.  This interpretation is consistent with Dr. Bulczynski's referring Plaintiff to physical therapy and describing her MRIs as failing to reveal nerve impingement or new rotator cuff injuries.

Regarding the length of Dr. Bulczynski's treating relationship with Plaintiff, Plaintiff argues (with no citations to the AR) that "Dr. Bulczynski examined [Plaintiff] on multiple occasions and provided detailed reports to support his opinions."  (JS at 20.)  In fact, Dr. Bulczynski assessed the 5-pound lifting

---

[5] As a point of comparison, a gallon of milk weighs about eight pounds.

restriction after his first examination of Plaintiff. AR 713. ALJs can consider the length of a treating relationship when considering how much weight to give a medical opinion. See Trevizo v. Berryhill, 871 F.3d 664, 676 (9th Cir. 2017).

Regarding inconsistency with other contemporaneous medical opinions, Plaintiff argues that the "ALJ failed to identify specific evidence or opinions that were inconsistent with the opinion of Dr. Bulczyn[s]ki." (JS at 20.) The ALJ, however, had earlier summarized the opinions of Plaintiff's treating orthopedic surgeon, Dr. Rosenberg, who released her to return to work in May 2012, concluding that she could return to her regular janitorial duties without restrictions. AR 33, citing AR 566.[6] Dr. Rosenberg found that Plaintiff exhibited a normal active and passive range of motion in both shoulders in all directions. Id., citing AR 564. Thus, the ALJ's finding of inconsistency was adequately explained and supported by substantial evidence.

In sum, the ALJ's three stated reasons are specific and legitimate reasons for discounting Dr. Bulczynski's extreme lifting restriction.

### 3. Dr. Coppelson.

Plaintiff contends that the ALJ failed to "reject, discuss or acknowledge Dr. Coppelson's May 2012 opinion." (JS at 18.) Not so; the ALJ discussed this opinion. AR 33. Plaintiff also argues, "The ALJ failed to provide reasons for rejecting the opinion of Dr. Coppelson." (JS at 38.) The ALJ did not reject his opinion but instead noted that Dr. Coppelson's examination did not reveal "evidence of serious physical impairment." Id., citing AR 664-79. Plaintiff has not carried her burden of showing legal error in the ALJs evaluation of Dr.

---

[6] This was a change from Dr. Rosenberg's opinion in September 2010 that Plaintiff's work-related use of her right arm was limited, such that she could not perform overhead reaching or lifting, pulling, or pushing over ten pounds. AR 476. Dr. Rosenberg apparently believed that Plaintiff's condition had improved after her shoulder surgery.

13

Coppelson's medical evidence.

### 4. Dr. Horst.

The ALJ discussed Plaintiff's mental health treatment records from SFMHC but did not mention Dr. Horst by name. AR 32. The ALJ found that Plaintiff's depressive disorder was a severe impairment. AR 28. Plaintiff fails to demonstrate that the ALJ "functionally rejected" any opinions of Dr. Horst concerning her functional limitations.

### 5. Chiropractor Padveen.

In connection with Plaintiff's worker's compensation claim, chiropractor Brian Padveen authored a report dated October 8, 2012. AR 402-18. Padveen related the history of Plaintiff's industrial injury and 2010 surgery. AR 403-05. After retaining counsel, she "utilized her right to change physician" and selected Padveen. AR 405. He did not review Plaintiff's medical records before writing the report. AR 414. Plaintiff told him that her "current lifting ability from ground to waist level is less than 5 pounds." AR 408. He observed a reduced range of motion in Plaintiff's cervical spine and right shoulder. AR 410. Under diagnostic impression, he noted "rule out recurrent tear of the right rotator cuff" and "lumbar spine strain," among other conditions. AR 415. He opined that she was "temporarily totally disabled" and should pursue chiropractic treatment and additional MRIs.[7] AR 417.

The ALJ gave "little weight" to the opinions expressed by Padveen as "neither well supported by medical findings nor consistent with the record as a whole." AR 34. The ALJ also noted that Padveen's characterization of Plaintiff as "totally disabled" is a conclusion on an issue reserved to the Commissioner. Id.

The ALJ only needed to provide a "germane" reason supported by

_____

[7] As discussed above, Plaintiff did obtain additional MRIs, discussed by Dr. Bulczynki, that did not reveal new rotator cuff tears or other injuries.

substantial evidence for discounting the opinions of Padveen. The ALJ did so by pointing out that his opinions were inconsistent with other doctors who examined Plaintiff during approximately the same time. AR 34. In May 2011, Dr. Rosenberg opined that Plaintiff could return to work with no restrictions. AR 638. In May 2012, Dr. Coppelson observed a full range of motion in Plaintiff's cervical spine and did not note any complaints about lumbar pain. AR 664-66. In June 2012, Dr. Bulczynksi did not diagnose Plaintiff with any injury of the lumbar spine. AR 713. Thus, the ALJ's finding of inconsistency is supported by substantial evidence.

### 6. Dr. Wallack.

CE Dr. Michael Wallack examined Plaintiff on September 9, 2013. AR 345. At that time, her only treatment for back and neck pain was taking Motrin daily. Id. Dr. Wallack assessed that she had no tenderness to palpation and the straight leg raising test was negative both sitting and supine. AR 347. She had a full range of motion but discomfort of the right shoulder upon full abduction and full flexion. AR 348. Dr. Wallack described Plaintiff as "agile" and with a "normal" gait. AR 349. He found her lifting, standing, walking, and sitting capacities to be unlimited, but restricted her to only "frequent" use of her right arm above a horizontal position. AR 349-50.

The ALJ discussed Dr. Wallack's opinions, as follows:

> Like Dr. Rosenberg before him, Dr. Wallack assessed the claimant as having "no limitation(s)" in the ability to perform basic physical work activities (AR 349-50). Dr. Wallack's conclusion is notably consistent with the most recent treatment records from Facey Medical Group, which show that in November 2013 the claimant acknowledged she was "generally feeling well without any specific complaints" (AR 357).

AR 34.

The ALJ ultimately assessed an RFC more limited than Dr. Wallack's opinions. AR 30. Plaintiff fails to demonstrate prejudicial legal error in the ALJ's evaluation of Dr. Wallack's opinions.

C. **Issue Three: Plaintiff's RFC.**

### 1. Rules for Formulating an RFC.

A claimant's RFC is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); see also 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(c) (defining an RFC as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs"). "[T]he ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015). In formulating an RFC, the ALJ weighs medical and other source opinions, as well as the claimant's credibility. See, e.g., Bray v. Comm'r of SSA, 554 F.3d 1219, 1226 (9th Cir. 2009). Further, the ALJ must consider "all of [a claimant's] medically determinable impairments"—whether severe or not—when assessing a RFC. 20 C.F.R. §§ 405.1545(a)(2), 416.945(a)(2).

### 2. Analysis of Claimed Errors.

#### a. Exertional Limits.

The ALJ found that Plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently. AR 30. The ALJ also found that Plaintiff could sit, stand, or walk for 6 hours/day. Id. The ALJ limited Plaintiff to frequent (i.e., no more than two thirds of the time) overhead reaching and handling with her right arm. Id. Plaintiff argues that these lifting, sitting/standing/walking, and reaching restrictions are not supported by the medical evidence. (JS at 40.)

In determining Plaintiff's RFC, the ALJ took a middle position between the opinions of Dr. Rosenberg (who opined in 2011 that Plaintiff could return to work without restrictions [AR 638]) and Dr. Wallack (who opined in 2013 that Plaintiff

16

could work with almost no restrictions [AR 349-50), on the one hand, and Dr. Bulczynski (who limited Plaintiff to lifting five pounds [AR 713]), on the other hand.  Instead of endorsing either extreme, the ALJ gave "great weight" to the state agency medical consultants Dr. Mani and Dr. Harris.  AR 34-35 (citing AR 101-12 and 114-23).

In September 2013, Dr. Mani opined that Plaintiff could lift up to 25 pounds frequently and 50 pounds occasionally.  AR 107-08.  Dr. Mani also opined that Plaintiff could sit, stand, or walk for 6 hours/day.  AR 108.  Dr. Mani limited Plaintiff to "frequent" pushing or pulling, reaching overhead, and handling with her right arm or hand.  AR 108-09.  In January 2014, Dr. Harris echoed this assessment.  AR 120-21.  Both gave great weight to CE Dr. Wallack as providing objective opinions consistent with the treating records.  AR 107, 120.

Indeed, in May 2013, Plaintiff visited the Facey Medical Group for a follow-up appointment after hysterectomy surgery.  AR 367.  She reported that she "has had some back pain since surgery," but "her pain has been improving progressively. She is doing much better now."  Id.  "However when she sits for a long time or walk[s] for long time she still has pain."  Id.  "She still takes Motrin every 8 hours … As well as codeine to stay ahead of the pain.  She is unsure if she needs it."  Id.  Dr. Soumah scheduled a follow-up appointment in four weeks, encouraging Plaintiff to take "less Tylenol with codeine and focus on taking Motrin once or twice a day."  Id.

In August 2013, Facey Medical Group noted that Plaintiff was "trying to diet or exercise."  AR 360.  The physical examination findings were the same as those described below.  AR 361.

In November 2013, Plaintiff went to the Facey Medical Group for a "routine physical exam and breast exam."  AR 357.  She told the medical staff "she is generally feeling well without any specific acute complaints today."  Id.  She also reported that her hysterectomy had caused her pain the last few months.  Id.  The

17

only pain medication she reported was ibuprofen.  AR 358.  She reported good appetite, no dizziness, and no motor weakness.  Id.  Dr. Mona Ghobrial observed her neck to be supple with a full range of motion.  Id.  Dr. Ghobrial recorded her strength as "5+/5+."  Id.  Dr. Ghobrial recommended "weight-bearing exercise."  AR 359.

Later in December 2013, Facey Medical Group noted that while Plaintiff had complained of pelvic pain for the past 8 or 9 months, "she feels much better now.  Her pain has completely resolved since the sutures [from the hysterectomy] were removed [in November 2013 per AR 365]."  AR 364.

These records are consistent with Plaintiff experiencing some neck and right-shoulder pain after her surgery in 2010 – but not pain that would disable her from performing medium exertional work and some reaching between 2012 and 2016.  Plaintiff has not shown that the ALJ erred by giving great weight to the moderate opinions of the state agency consultants as more consistent with these treating records and the opinions of the objective CE rather than crediting the extreme opinions of the doctor and chiropractor who supported Plaintiff's worker's compensation claim.

b.  Non-Exertional Limits.

Plaintiff argues that the ALJ should have included additional non-exertional limitations in the RFC based on mental health treating records from Dr. Horst and SFMHC.  (JS at 41.)  Plaintiff argues that these records show "limitations in her ability to appropriately interact with co-workers, supervisors and the public which were not included in the ALJ's RFC assessment."  (JS at 42.)

In June 2013, she told the Facey Medical Clinic that she was seeing a psychiatrist "because she has a history of depression."  AR 366.  In March, May, and November 2013, however, the clinic noted that Plaintiff displayed "no signs or symptoms of acute depression."  AR 365, 367, 371, 373.

In chronological order, the Court summarizes SFMHC's records, as follows:

18

• November 6, 2014: Plaintiff was referred for a medical evaluation with Dr. Doane.  AR 766.  Plaintiff agreed to trial of Zoloft for depression.  AR 765.

• December 16, 2014: Upon intake assessment. Plaintiff's reported symptoms included crying spells, low energy, worry about her finances, poor sleep, and low self-esteem.  AR 725.  Plaintiff agreed to a treatment plan with goals and objectives.  AR 726.

• January 6, 2015: Plaintiff reported feeling stable and in "okay" spirits.  AR 722.  Plaintiff was assigned to Dr. Horst for medication treatment support services.  AR 724.  Dr. Horst scheduled his first appointment with her for January 21.  AR 745.

• January 7, 2015: Dr. Keshava discontinued Zoloft due to side effects and prescribed Celexa, noting that Plaintiff was also taking trazodone.  AR 764.

• January 21, 2015: Plaintiff saw Dr. Horst for a medical evaluation.  She showed him bottles of prescriptions for trazodone and Celexa.  She told him she had suffered from depression for three years.  She reported heart palpitations caused by Zoloft but denied these side effects since changing to Celexa.  AR 742.

• February 5, 2015: Plaintiff reported feeling better and that she had recently enrolled in ESL classes.  She also reported participating in some groups at the clinic and requested more information.  AR 733.  Her treatment goal was to reduce crying spells from daily to 3 times/week with medication support services and therapy.  Id.

• February 12, 2015: Plaintiff reported "feeling much better than [she] was feeling several months ago."  The medication prescribed last month by the psychiatrist helped her feel motivated to begin healing from the past and moving forward.  She stated that she was currently attending ESL courses 5 days a week, eating healthier, and taking a 10-minute walk 3 times a week.  AR 732.

• March 2, 2015: Plaintiff reported that the medication was helping her sleep and stay motivated, but she was still experiencing crying spells and sad moods.

1  She wanted to review the group therapy list to consider participation.  AR 731.

2       • April 16, 2015: Plaintiff reported feeling slightly better than the last

3  session due to increasing her social activities to once a week.  She stated that

4  sometimes she would rather be alone, but her sisters encouraged her to spend time

5  with them.  While she continued to take medication as prescribed, she advised that

6  she wanted to taper off medication because she did not want to be on medication

7  for the rest of her life.  AR 730.  She discussed her medication with Dr. Horst,

8  telling him that Celexa helped but she had stopped trazodone because it was "too

9  strong."  She was also taking over-the-counter Benadryl and agreed to a trial of

10  hydroxyzine as needed.  AR 738.

11       • July 14, 2015: Plaintiff reported still feeling depressed with low energy and

12  low motivation, but she saw some benefit from a higher dose of Celexa.  She

13  decided not to try group therapy, but she agreed to add Wellbutrin to her

14  medications.  AR 736.

15       • July 23, 2015: Plaintiff described regular crying spells and explained, "I

16  don't want my symptoms to interfere with ability to focus at school so that's why I

17  am asking for help."  She discussed practicing positive affirmations and journaling

18  with a social worker.  AR 728.

19       • August 13, 2015: Plaintiff was feeling better due to practicing the adaptive

20  coping skills discussed at the last session.  AR 727.  She discussed her medications

21  with Dr. Horst which included Wellbutrin, Celexa, hydroxyzine, and blood

22  pressure medication.  AR 734.

23       These records do not establish that Plaintiff could only work if restricted

24  against interacting with co-workers, supervisors and the public.  To the contrary,

25  they show that she was able to have productive interactions with multiple staff

26  members at SFMHC, learn and practice coping skills, and take daily ESL classes.

27  Overall, they reflect medication adjustments and improvement in Plaintiff's

28  emotional state.  Plaintiff fails to demonstrate legal error in the ALJ's RFC

assessment accounting for the functional limitations caused by her depression.

## V.

## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: <u>December 12, 2018</u>

_Karen E. Scott_
_____
KAREN E. SCOTT
United States Magistrate Judge